Henry W. Lengyel, J.
This duly filed claim for personal injury damages arose out of an incident which occurred on July 25, 1969, in the Dutch Quadrangle, a dormitory area of the State University of New York at Albany. The claimant was a student at the university working for his masters degree. The parties stipulated that only the question of liability should be tried at this time. It was agreed that, if the court determined the question of liability in favor of the claimant and adversely to the State, medical proof and proof of damage should then be presented.
The Dutch Quadrangle was an open area or large courtyard created by eight buildings surrounding a tower. A number of pillars supported portions of the roof overhang of said buildings. The claimant resided on the- 19th floor of one of these dormitory buildings.
On the evening of July 24, claimant entertained his fiancee in the dormitory area. Shortly after midnight, he escorted her to her motel and, about 1:00 or 1:30 a.m., he returned to his dormitory. As he walked through the Dutch Quadrangle, he was accosted by a black man who asked him to come with him to look at something on one of the pillars. Claimant was white. Although he stated the black man was a student, there was no further proof of that fact. He testified that the black man said he was a ‘ little high or something like that.” In any event, he went with the black man who led him to a pillar upon which were written -some obscene phrases. Claimant testified that he said he thought the writings were pretty bad. He said the black man made some more remarks and then unexpectedly struck the claimant with what he denominated a “ sucker punch ” in the face. Claimant was driven to his knees, his eyeglasses were broken and his face was lacerated. He got up and went into the tower building where he met Mr. Woodruff, who was a residence hall director. Claimant was removed to the infirmary for treatment.
Mr. Woodruff stated that it was not unusual for students to write on columns and walls of the university buildings. When he thought the writings were detrimental to the health, safety, and well-being of the students, he would order them removed. It was not clear when the writings in question were inscribed. *450 Suffice it to say, they were the usual four letter, sexually oriented asininities which seem to be in vogue in our enlightened, well-educated society.
Mrs. Greene was one of Mr. Woodruff’s secretaries during the summer of 1969. She testified that, at about 4:15 p.m. on July 24, two black students entered her office and complained about profanities written on a pillar in the Dutch Quadrangle between Ten Eyck and Ten Broeck Halls. She said these students were pleasant and courteous but were disgusted and thought something should be done. Mrs. Greene advised the students that the maintenance people went off duty at 4:00 p.m. but that she would report their complaint to her supervisor. Shortly thereafter, Mrs. Greene left her office to deliver mail to Stuyvesant Tower. On her way she met Carl Spoto, a graduate student and part-time assistant to Mr. Woodruff. She advised Mr. Spoto of the complaint and they went to the Dutch Quadrangle area to look for the obscene writing. They found an obscene phrase. However, this phrase was sexually directed to the whites and and was not the language which claimant observed before he was struck, and which was directed to the blacks.
That evening between 10:00 and 11:00 o’clock a group of “loud, noisy, black students” created a disturbance in the Dutch Quadrangle between Ten Eyck and Ten Broeck Halls. There was no viable proof that these students were protesting the written vulgarities on the building pillars. There was a possibility that such was the situation. Possibility, of course, is not fact. Mr. Woodruff was called but, by the time he arrived at about 11:00 o’clock, the group had dispersed.
Claimant had walked through the Dutch Quadrangle area between 9:00 and 10:00 p.m. and again did so shortly after 12:00 p.m. to take his fiancee to her motel. He stated he did not observe anything unusual at those times and that things were generally quiet.
We do not find that any lack of regulations relating to the maintenance of buildings or the conduct of the students was a proximate cause of this incident. We do not find that any lack of police protection was a proximate cause of this incident. We do find that the writings set forth in Exhibits “ 1 ”, “ 2 ”, and “ 4 ’’mighthave been an excuse for this incident.
We have used the word “ excuse ’’instead of “ cause ” because there was no way for us to ascertain that these profane words caused the assault. Certainly there was no difinitive proof to that point; or, even proof from which we could fairly so assume. Possibly the black attacker was motivated by the writing; or, *451 possibly by the fact that he was a “ little high ”; or, possibly by some economic-sociological individual mental disturbance; or, possibly by the apparent fact that at times a percentage, fortunately a small percentage if one can denominate even a miniscule percentage as fortunate, of blacks and whites strike out at one another orally and/or physically. "When such happens the State cannot be held liable for what flows therefrom unless we have a clear and present danger to the public weal and the State negligently performs its duties in response to such a danger.
We do not find that the State was negligent in the performance of its duties and responsibilities. It was not given notice of the writing until after the maintenance staff had gone off duty. Obviously, from Exhibits “ 1 ” and “ 2 ”, this writing was not easily removable. In our opinion, the next working day was a reasonable time in which to remove the writing. Furthermore, if the State had received notice of the writing while the maintenance staff was on duty and had not, for one reason or another, removed the writing on the day of notice, we would not consider this negligence which proximately caused this assault and for which it should be required to pay damages. The phrases written on the pillar were disgusting and shameful but they did not constitute such a clear and present danger to the public safety as to require more than ordinary custodial care. Phrases like this are written on walls, pillars, sidewalks, subway cars, and many other public areas throughout the Empire State. If the State and the-various municipalities were to be held responsible for that which may be generated, or is alleged to be generated, by such phrases, there might not be time enough for the State and other governmental bodies to fulfill governmental duties other than cleaning walls. We do not believe such a standard of responsibility can be imposed upon the State or its municipalities. Specifically in this claim, we shall not impose such a standard upon the State of New York.
Claimant is a clean, decent, intelligent man and his fiancee, now his wife, appeared to be of similar caliber. She did not testify but we observed her in our courtroom during the trial. Our sympathy goes out to these youg people but sympathy is not equatable with liability and damage.
As we have determined that the State was not negligent, it is not necessary for us to reach the question of contributory negligence; and, we have not done so.
We reserved decision on the State’s motion to dismiss the claim. We now grant said motion on the grounds that the State was not negligent in any respect.